## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | (Judge Conner ) |
| | : | |
| ALEX MGBOLU, | : | |
| CHIMA NNEJI, and | : | |
| WILLIAM NNEJI | : | |

**FILED**
HARRISBURG

SEP 1 2 2012

MARY E. D'ANDREA, **CLERK**
Per_____
          DEPUTY CLERK

### INDICTMENT

### COUNT 1
**(Conspiracy to Commit Mail Fraud, Wire Fraud and Money Laundering)**

## A. Background

Beginning in or around July 2002 and continuing through May 2010, domestic and foreign based fraudulent mass marketers, both known and unknown to the Grand Jury, instructed victims to send Western Union and MoneyGram money transfers to satisfy advance fee conditions associated with:

1. Falsely promised lucrative financial awards, loans and offers;

2. The purchase or sale of various products via the internet; or

3. To resolve non-existent personal and family emergencies.

Some of the mass marketing schemes included the manufacture, distribution and negotiation of counterfeit checks. The mass marketers used fictitious names, titles, companies, and addresses when they communicated with victims, and instructed the victims to send the Western Union and MoneyGram money transfers payable to fictitious name payees.

The defendants **ALEX MGBOLU**, **CHIMA NNEJI and WILLIAM NNEJI**, individually, or through co-conspirators, directed, established and recruited various Western Union and MoneyGram agents, hereinafter sometimes referred to as complicit agents, to process the fraud induced money transfers. The defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI**, and co-conspirators known and unknown to the grand jury, as either middleman or mass marketers, presented the money transfer transactions to the complicit agents in order to convert the money transfers to cash and checks.   The complicit Western Union and MoneyGram agents, including the defendants **ALEX MGBOLU, CHIMA NNEJI and WILLIAM NNEJI,** entered false payee and sender biographical information and identification data into the Western Union and MoneyGram data bases in order to maintain the anonymity of the fraudulent mass marketers and to conceal the nature, location, source, ownership, and control of the fraudulent proceeds.   The Western Union and MoneyGram Money Transfer Checks issued by the complicit agents were deposited to bank accounts controlled by the defendants **ALEX MGBOLU, CHIMA NNEJI and WILLIAM NNEJI**.   The defendants **ALEX MGBOLU, CHIMA NNEJI and WILLIAM NNEJI** distributed the fraudulent proceeds among the co-conspirator complicit agents, mass marketers and middleman.

As used in this Indictment, the term "mass marketer" or "mass marketers" refers to an individual, or group of individuals, who use one or more means of mass communication media, to include the mail, telephone and internet, to distribute fraudulent sweepstakes, loan, employment opportunity and other lucrative financial awards and offers.

The mass marketing schemes included, but were not limited to the following:

SWEEPSTAKES SCHEMES

- Advance fee sweepstakes schemes wherein purported "winners" were directed to pre-pay processing fees and taxes in order to collect their cash prizes.  The Western Union and MoneyGram payees were falsely identified as representatives of public or private sweepstakes organizations or taxing authorities.

LOAN SCHEMES

- Advance fee loan fraud schemes wherein purported successful loan applicants were directed to pay advance fees to purchase insurance or to place security deposits in order to receive guaranteed loan proceeds.  The Western Union and MoneyGram payees were falsely identified as representatives of the purported lenders.

EMPLOYMENT OPPORTUNITY SCHEMES

- Employment Opportunity schemes wherein job seekers were directed to cash checks and use the proceeds to complete purchases, and send Western Union and MoneyGram money transfers to evaluate retail stores, Western Union and MoneyGram.  The victims, sometimes referred to as "secret shoppers", were directed to retain a portion of the cash proceeds as payment for their services.

PERSON IN NEED SCHEMES

- Person in Need schemes wherein mass marketers developed an on-line relationship with intended victims or posed as a relative, typically a grandchild, in order to induce the intended victims to send  Western Union or MoneyGram  money transfers for a false need or emergency.

INTERNET PURCHASE SCHEMES

- Internet purchase schemes wherein mass marketers posed as the sellers of large ticket items, in most instances at a lucrative price.  The mass marketers directed the purchasers to send Western Union or MoneyGram money transfers as payment for the items.  In some instances the money transfers were made payable to purported third parties to guarantee delivery of the items.  The products were never delivered.

Domestic and foreign based mass marketers distributed the fraudulent prize notifications and employment opportunities accompanied by checks via Canada Post and the United States mail. The advance fee loan fraud offers were routinely distributed via the internet. Telemarketers falsely authenticated the prize notifications, employment opportunities, and loan offers. Telemarketers directed the recipients to cash the checks to fund the pre-payment of fees which were reportedly a condition of prize delivery, or to complete retail purchases and send Western Union and MoneyGram money transfers in order to evaluate the respective businesses pursuant to the employment opportunity schemes. The checks cashed by the purported "winners" and "secret shoppers", hereinafter victims, were counterfeit, and returned unpaid to the banks of first deposit. The banks of first deposit initiated collection procedures against the victims for the total value of the counterfeit checks. The advance fee loan schemes did not ordinarily include the delivery of a check to the intended victim. As a condition of loan issuance, loan fraud victims were instructed to use personal funds to send Western Union and MoneyGram money transfers to complete collateral and insurance payments. The prize notifications, employment opportunities and loan offers were fictitious and the claimed association with legitimate public and private sweepstakes or lottery organizations, customer service evaluation businesses and lenders was false.

As used in this Indictment, the term "complicit agent" describes a Western Union or MoneyGram agent who permitted mass marketers, in some instances, middlemen, to cash fraud induced Western Union and MoneyGram money transfers payable to multiple fictitious names. The "complicit agents", entered false names and identification data into the Western Union and MoneyGram computer data bases to conceal the true identity of the mass marketers from the victims, law enforcement and regulatory agencies. The mass marketers, middlemen and "complicit agents" used thousands of different payee names in order to avoid detection and the scrutiny of anti-money laundering protocols.

The "complicit agents" converted the fraud induced Western Union and MoneyGram money transfers to cash or negotiable Money Transfer Checks (MTCs) drawn on the Western Union and MoneyGram bank accounts.

At all times pertinent to this Indictment:

1.  Western Union and MoneyGram were publicly traded global money transfer companies, sometimes referred to herein as Money Service Businesses (MSBs). The Western Union and MoneyGram networks consisted of over 500,000 agents, sometimes referred to as outlets, worldwide. Typical Western Union and MoneyGram money transfers are sent among (to and from) family members and close acquaintances. The average dollar amount of a typical North American Western Union and MoneyGram money transfer approximates $400.

2.  Western Union and MoneyGram money transfer senders were required to present cash and complete a handwritten application, known as a "To Send Money" (Western Union) or "Send" (MoneyGram) form at an authorized Western Union or MoneyGram agent location. The senders were required to list the amount of the transfers, the names of the payees (receivers), the expected payout locations, and their own names, telephone numbers and addresses on the "To Send Money" and "Send" forms. The Western Union and MoneyGram agents collected the money transfer amounts, plus money transfer fees from the senders, and entered the senders' biographical and identification data, along with the names of the intended payees into the Western Union and MoneyGram transactional data bases. Western Union assigned 10 digit Money Transfer Control Numbers (MTCNs) and MoneyGram assigned 8 digit Reference Numbers, hereinafter "serial numbers" to the transactions.

3.  Western Union and MoneyGram payees were required to physically enter authorized Western Union and MoneyGram agent locations (outlets) and complete  handwritten applications, known as "To Receive Money" (Western Union) and "Receive" (MoneyGram) forms. The payees were directed to list their own addresses and telephone numbers, and the name, city and state of the senders and the expected money transfer amounts on the "To Receive Money" and "Receive" forms. The payees presented the completed "To Receive Money" and "Receive" forms to the Western Union and MoneyGram agents. The Western Union and MoneyGram agents

were then required to query the Western Union or MoneyGram transactional data bases to determine whether the money transfers had been sent by the senders identified by the payees. For all money transfers in an amount equal to or greater than $1,000 (Western Union) or $900 (MoneyGram) the payees were required to present valid identification documents for examination by the Western Union and MoneyGram agents. The Western Union and MoneyGram agents were required to enter the payee names, addresses, telephone numbers, and identification document serial numbers into the Western Union and MoneyGram transactional data bases.

4.  In accordance with Western Union and MoneyGram policy, all Western Union and MoneyGram agents named in this Indictment were required to issue Money Transfer Checks (MTCs) payable to the named money transfer payee in order to document the transaction. The money transfer payee was required to endorse the MTCs in the presence of the agent. Upon endorsement, the agent was expected to issue the appropriate amount of cash to the payee. The agent deposited the MTCs to their business bank account as reimbursement for the cash disbursed to the money transfer payee. In no instance were the agents permitted to issue the MTCs to a third party individual or company.

5.  The relevant Western Union and MoneyGram MTCs issued by the complicit agents and unindicted co-conspirators named in this indictment were collected from complicit agents by the defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and unindicted co-conspirators known and unknown to the grand jury, and deposited to bank accounts controlled by the defendants **MGBOLU, CHIMA NNEJI and WILLIAM NNEJI.** In some instances, the MoneyGram MTCs were made payable to FA CAM or Hallmark Services, an unauthorized third party payee, and not the fictitious name money transfer payee.

6.  If a sender of a fraud induced money transfer reported their victimization to Western Union or MoneyGram, the MSB would log the transaction as a Consumer Fraud Report (CFR). Only a fraction of those victimized reported their victimization to

Western Union and MoneyGram.  Western Union and MoneyGram calculated the cumulative number and dollar value of the Consumer Fraud Reports processed by a particular agent.  If an agent's CFR numbers were materially excessive, the agent was sometimes terminated by Western Union and MoneyGram for their apparent complicity in mass marketing fraud activity.  Each of the agents named in this indictment were terminated by either Western Union or MoneyGram.

7. Regardless of the expected city and state listed by MoneyGram and Western Union money transfers senders, the money transfers relevant to this Indictment were converted to MTCs and cash in the Greater Toronto Area by the defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and other complicit money service business agents known and unknown to the grand jury.  The complicit agents processed the fraud induced money transfers in the absence of bona-fide payees.  Instead, the money transfer "serial numbers" were presented via telephone or text messages to the complicit agents.  The complicit agents processed the transactions and typically handed the MTCs to the defendants **ALEX MGBOLU, CHIMA NNEJI and WILLIAM NNEJI** or the defendants' accomplices.  The fraud proceeds were withdrawn from the bank accounts controlled by the defendants and distributed among the complicit agents, middlemen and mass marketers.  The defendants **ALEX MGBOLU, CHIMA NNEJI and WILLIAM NNEJI** kept or shared an approximate 10% to 15% cut of the fraud induced money transfers for their role in the conspiracy.

8. In or about July 2002, the defendant **ALEX MGBOLU**, as the reported 100% owner of 1523628 Ontario Inc., doing business as FA CAM Associates and Financial, hereinafter FA CAM, and as Personal Guarantor, applied for a Western Union Agency Agreement (Canada).  During the period April 2005 through April 2006, alone, the defendant, as FA CAM, processed suspect transfers totaling $3 million which were sent from the United States.  During the period October 2005 through April 2006, alone, Western Union senders reported that 172 money transfers, totaling $363,412, paid at FA CAM were induced by fraudulent mass marketing activity.  FA CAM processed more reported fraud induced money transfers than any other Western

Union agent in the United States or Canada.   During this period, Western Union agents situated in the Province of Ontario processed more reported fraud induced money transfers than any other Province or State.   FA CAM processed one (1) of every twelve (12) reported fraud induced money transfers processed in the province of Ontario.   In or about February 2006, Western Union warned the defendant MGBOLU that the continued processing of suspect money transfers could result in termination of the agency agreement.   The activity continued unabated, and in or about April 2006, Western Union terminated FA CAM's authority to process Western Union money transfers.   As a Western Union agent, FA CAM processed 213 reported fraud induced money transfers, totaling $453,119.   Since 2002, FA CAM is one (1) of only five (5) Western Union agents in the United States or Canada that processed more than 200 reported fraud induced money transfers.

9.   On or about May 25, 2006, the defendant **ALEX MGBOLU**, as the reported 100% owner of FA CAM Associates and Financial Corp., doing business as FA CAM Associates, hereinafter FA CAM, and as Personal Guarantor applied for a MoneyGram International Money Transfer Agreement.   The defendant failed to disclose to MoneyGram that Western Union had terminated FA CAM's authority to process money transfers during the past 30 days due to excessive consumer fraud reports.   In or about June 2006, MoneyGram authorized the Agency Agreement.   During the period August 2006 through September 2007, alone, MoneyGram senders reported that 67 money transfers, totaling $149,723, paid at FA CAM were induced by fraudulent mass marketing activity.   In or about September 2007, MoneyGram restricted FA CAM's receive authority to a maximum of $1,000 per transaction.   Despite the restriction, during the period October 2007 through March 2009, MoneyGram senders reported that 19 money transfers, totaling $14,716, paid at FA CAM were induced by fraudulent mass marketing activity.   On or about March 31, 2009, MoneyGram terminated FA CAM's authority to process MoneyGram money transfers.   After termination, the defendant **MGBOLU** continued to operate FA CAM to launder fraud induced Money Transfer Checks issued by multiple complicit MoneyGram and Western Union agents.

10. The table, below, lists the MoneyGram agent locations that processed fraud induced money transfers in a manner that maintained the anonymity of the mass marketers, and concealed the nature, location, source, ownership, and control of the fraud proceeds. The table lists the number and dollar value of the Consumer Fraud Reports (CFRs) processed by the MoneyGram agent. MTCs issued by the complicit agents relevant to this Indictment were made payable to either the fictitious name money transfer payee or FA CAM and deposited to the FA CAM bank account controlled by the defendant **ALEX MGBOLU.**

| Agent Name | # CFRs | $ CFRs |
|---|---|---|
| BOMBAY GROCERS | 55 | $190,645 |
| CELLNET DEPOT | 52 | $120,509 |
| DHILLON BUSINESS CENTRE | 65 | $192,527 |
| INTER CHANGE SERVICES | 124 | $301,190 |
| Totals | 296 | $804,871 |

11. The table, below, lists Western Union agent locations that processed fraud induced money transfers during the period January 2009 through May 2010 in a manner that maintained the anonymity of the mass marketers, and concealed the nature, location, source, ownership, and control of the fraud proceeds. Western Union MTCs issued by the complicit agents relevant to this Indictment were made payable to the fictitious name money transfer payee and deposited to the FA CAM bank account controlled by the defendant **ALEX MGBOLU.** The table lists the number and dollar value (US) of the Consumer Fraud Reports (CFRs) processed by the Western Union agents, and the total dollar value (Cdn) of the MTCs deposited to the FA CAM bank account.

| Agent Name | # CFRs | CFRs $s | MTCs $s |
|---|---|---|---|
| CASH HOUSE | 18 | $17,751 | $112,719 |
| DAISY MART | 28 | $58,953 | $457,304 |
| HASTY MARKET (BRITANNIA) | 65 | $156,910 | $424,180 |
| HASTY MARKET (HOWDEN) | 41 | $101,961 | $932,137 |
| JINGTAO CONVENIENCE | 43 | $101,132 | $315,198 |
| KARNAPHULI MARJAN BAZAR | 11 | $26,145 | $312,976 |
| THE UPS STORE | 54 | $122,826 | $260,481 |
| UNITED CONVENIENCE | 14 | $32,792 | $99,614 |
| WESTNEY #2 FOOD MART | 38 | $78,182 | $351,656 |
| Totals | 312 | $696,652 | $3,266,265 |

12. In or about December 2004, the defendant **CHIMA NNEJI,** as the reported owner of Advanced Computer Service, was awarded a Western Union Agency Agreement (Canada). During June 2005, alone, Western Union senders reported that 14 money transfers, totaling $32,671, paid at Advanced Computer Service were induced by fraudulent mass marketing activity.  In or about July 2005, Western Union terminated Advanced Computer Service's authority to process Western Union money transfers after Western Union learned that MTCs issued by Advanced Computer Service were deposited to a bank account owned by a former terminated Western Union agent named C K Business Service.  After the Western Union termination, the defendants **CHIMA and WILLIAM NNEJI** resurfaced as partners trading as Hallmark Services. During the period February 2006 through April 2006, Western Union MTCs totaling $1,552,572 (Cdn) issued by complicit agents in the Toronto area were deposited to the Hallmark Services bank account.

13. On or about May 10, 2005, the defendant **CHIMA NNEJI**, as the reported 100% owner of Hallmark Services and as Personal Guarantor, applied for a MoneyGram International Money Transfer Agreement.  During the period September 2005 through April 2007, MoneyGram senders reported that 131 money transfers, totaling $291,316, paid at Hallmark Services were induced by fraudulent mass marketing activity.  The defendant **WILLIAM NNEJI, CHIMA NNEJI'S** brother, processed 63 of the reported fraud induced money transfers totaling $146,569.  In or about June 2007, MoneyGram terminated **CHIMA and WILLIAM NNEJI'S** authority to process MoneyGram money transfers based on their apparent complicity with fraudulent mass marketers and money launderers.  After termination, the defendants **CHIMA and WILLIAM NNEJI** continued to operate Hallmark Services, and partnered with the defendant **ALEX MGBOLU** to launder fraud induced Money Transfer Checks issued by complicit MoneyGram and Western Union agents.

14. In or about August 2007, an unindicted co-conspirator, the wife of the defendant **WILLIAM NNEJI**, as Zenith Fashions, was awarded a MoneyGram International Money Transfer Agreement. During the period August 2007 through March 2009, MoneyGram senders reported that 109 money transfers, totaling $315,651, paid at Zenith Fashions were induced by fraudulent mass marketing activity. On or about March 31, 2009, MoneyGram terminated Zenith Fashions' authority to process MoneyGram money transfers based on their apparent complicity with fraudulent mass marketers and money launderers.

15. The table, below, lists two MoneyGram agent locations, A1 Copy Center and Family Support Organization, that processed fraud induced money transfers in a manner that maintained the anonymity of the mass marketers, and concealed the nature, location, source, ownership, and control of the fraud proceeds. The table lists the number and dollar value (US) of the Consumer Fraud Reports (CFRs) processed by the MoneyGram agents, and the total dollar value (Cdn) of the MTCs deposited to the **NNEJIS'** Hallmark Services bank account. The MTCs were made payable to Hallmark Services, not the intended MoneyGram money transfer payee. Additional Family Support Organization MoneyGram MTCs were deposited to **MGBOLU'S** FA CAM account.

| Agent Name | # CFRs | $ CFRs | MTCs $s |
|---|---|---|---|
| AI COPY CENTER | 52 | $114,480 | $129,975 |
| FAMILY SUPPORT ORGANIZATION | 137 | $374,368 | $1,103,607 |
| Totals | 189 | $488,848 | $1,376,363 |

16. During the period 2002 through 2009, Western Union and MoneyGram money transfer senders reported that 1,350 money transfers, totaling $3,247,567 processed by the agent locations owned or operated by the defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and the unindicted co-conspirator complicit agents named herein were fraud induced. It is well established that only a fraction of the senders of fraud induced money transfers report their victimization to Western Union and MoneyGram. Accordingly, it is conservatively estimated that the dollar value of the fraud induced money transfers processed by the defendants and unindicted co-

conspirators exceeded $8 million. The suspect receives processed by the agents listed herein, including FA CAM and Hallmark Services, which were sent by United States senders, exceeded $10 million.

## B. The Conspiracy and Its Objects

17. Beginning in or about July 2002 and continuing through May 2010, in the Middle District of Pennsylvania and elsewhere, the defendants **ALEX MGBOLU**, **CHIMA NNEJI, WILLIAM NNEJI** and various co-conspirators, both known and unknown to the Grand Jury, did knowingly and willfully conspire and agree together and with each other, to commit various offenses against the United States; that is:

    a) To devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises through the use of the United States mail and private couriers, in violation of Title 18, United States Code, Section 1341, Mail Fraud, and;

    b) To devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire, radio and television communication in interstate and foreign commerce, any writings, signals, pictures and sounds in violation of Title 18, United States Code, Section 1343, Wire Fraud.

    c) To conduct a financial transaction affecting interstate commerce and foreign commerce, which involved the proceeds of specified unlawful activity, to wit, Mail Fraud in violation of 18 U.S.C. Section 1341, and Wire Fraud in violation of 18 U.S.C. Section 1343, with the intent to promote the carrying on of that specified unlawful activity, knowing that

the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and that while conducting the financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of Title 18 U.S.C. Section 1956, Laundering of Monetary Instruments.

## C.  Manner and Means of the Conspiracy and Scheme and Artifice to Defraud

18. It was part of the conspiracy and scheme and artifice to defraud that the defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and various co-conspirators, both known and unknown to the Grand Jury, agreed to obtain money and property; to wit, in excess of $8 million from thousands of victims through a scheme in which the co-conspirator mass marketers falsely promised loans, lucrative financial awards and other items of value.  It was also part of the conspiracy and scheme and artifice to defraud that the victims were told that in order to receive the loans, cash prizes, compensation, or various other financial awards they were required to make advance payments, which the co-conspirators characterized as "insurance", "security deposits", "taxes", "Customs' duties", or "processing fees" dependent on the nature of the underlying scheme.  It was also part of the conspiracy and scheme and artifice to defraud that in some instances the co-conspirators delivered counterfeit checks payable to the victims to fund the advance payments.  The co-conspirators directed the victims to cash the checks and wire the cash proceeds via Western Union and MoneyGram to fictitious name payees.  The mass marketers falsely represented to the victims that the Western Union and MoneyGram payees were bona-fide representatives of a business enterprise or governmental agency dependent on the nature of the underlying scheme.  The defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and other co-conspirator Western Union and MoneyGram agents, known and unknown to the Grand Jury, permitted the unindicted co-conspirator mass marketers to cash money transfers in multiple fictitious names.  The complicit agents simultaneously entered false addresses, telephone numbers and identification

document serial numbers into the Western Union and MoneyGram transactional data-bases.   In so doing, the defendants **ALEX MGBOLU**, **CHIMA NNEJI**, **WILLIAM NNEJI** and the co-conspirators concealed the true identity of the co-conspirator mass marketers, and the nature, location, source, ownership, and control of the fraudulent proceeds.   After the victims completed the Western Union and MoneyGram money transfers, the co-conspirators failed to distribute any of the promised loans, cash prizes, compensation, financial awards or products, and failed to refund the purported pre-paid "taxes", "Customs' duties", "processing fees", "collateral payments", "security deposits" and "insurance premiums".  The counterfeit checks deposited and cashed by the victims were returned unpaid, and the victims were responsible to reimburse the banks or entities which cashed the checks.   In order to effect this conspiracy and scheme and artifice to defraud, the defendants **ALEX MGBOLU**, **CHIMA NNEJI**, **WILLIAM NNEJI** and the various co-conspirators, both known and unknown to the grand jury, aided and abetted each other and with the knowledge and consent of all of the parties, engaged in the following fraudulent conduct:

a) The defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and unindicted co-conspirator complicit agents processed, or caused to be processed, the fraud induced Western Union and MoneyGram money transfers without the presence of a true Western Union or MoneyGram payee at the agent locations.

b) The defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and unindicted co-conspirator complicit agents processed, or caused to be processed, numerous Western Union and MoneyGram money transfers payable to multiple fictitious name payees on behalf of individual co-conspirators thereby not only maintaining the anonymity of the co-conspirators, but also evading the reporting requirements of the United States Bank Secrecy Act and Canada's Proceeds of Crime (Money Laundering) & Terrorist Financing Act (PCMLTFA).

c) The defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and unindicted co-conspirator complicit agents entered, or caused to be entered, false addresses, telephone numbers and identification document serial numbers into the Western Union and MoneyGram transactional data-bases incident to these transactions thereby maintaining the anonymity of the true cash recipient, and creating the illusion that a bona-fide payee physically entered the outlet. Furthermore, any sender or payee data reported to the United States and Canadian Treasury Departments by Western Union and MoneyGram for the suspicious transactions processed by the complicit agents was false.

d) The defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and other co-conspirators converted the fraud induced Western Union and MoneyGram money transfers to a combination of MTCs, cash, checks, bank wires and money transfers for their own personal enrichment and the enrichment of the co-conspirator mass marketers and middlemen.

e) The defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and unindicted co-conspirator complicit agents falsified, or did not complete, Western Union and MoneyGram "To Receive Money" and "Receive" forms, and did not properly endorse Western Union and MoneyGram receipts and checks issued incident to the fraud induced transactions.

f) The defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and other co-conspirators, issued, or caused to be issued, MoneyGram MTCs payable to third party entities, not the intended MoneyGram money transfer payee.

g) The defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and other co-conspirators, deposited, or caused to be deposited, the Western Union and MoneyGram MTCs in a manner which concealed the true nature, location, source, ownership, and control of the proceeds.

h) The defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and other co-conspirators, withdrew, or caused to be withdrawn, the proceeds of the Western Union and MoneyGram MTCs via a combination of cash and bank drafts which further concealed the true nature, location, source, ownership, and control of the proceeds.

i) The defendants **ALEX MGBOLU, CHIMA NNEJI, WILLIAM NNEJI** and other co-conspirators, distributed the proceeds of the Western Union and MoneyGram MTCs in a manner which further concealed the true nature, location, source, ownership, and control of the proceeds.

## D. Overt Acts

19. In or about July 2002, the defendant **ALEX MGBOLU**, as the reported 100% owner of 1523628 Ontario Inc., doing business as FA CAM, and as Personal Guarantor, applied for a Western Union Agency Agreement (Canada).

20. On or about September 20, 2005, H. S., a mass marketing fraud victim, sent a $1,140 Western Union money transfer from Newport, Pennsylvania payable to Laura Davis. The money transfer was processed by an unindicted co-conspirator complicit Western Union agent operating as Golden Century.

21. On or about September 21, 2005, two Western Union Money Transfer Checks totaling $1,278.73 (Cdn) issued by Golden Century payable to the fictitious name Laura Davis were deposited to the defendant **ALEX MGBOLU's** bank account in the name FA CAM.

22. On or about May 25, 2006, the defendant **ALEX MGBOLU**, as the reported 100% owner of FA CAM, and as Personal Guarantor, applied for a MoneyGram International Money Transfer Agreement. The defendant failed to disclose to MoneyGram that

Western Union had terminated FA CAM's authority to process money transfers during the past 30 days due to excessive consumer fraud reports.

23. On or about December 19, 2006, M. M., a mass marketing fraud victim, sent a $2,975 Western Union money transfer from Hanover Pennsylvania payable to Helen James. The money transfer was processed by an unindicted co-conspirator complicit Western Union agent operating as Rosewood Variety.

24. On or about December 20, 2006, two Western Union Money Transfer Checks totaling $3,304.96 (Cdn) issued by Rosewood Variety payable to the fictitious name Helen James were deposited to the defendant **ALEX MGBOLU's** bank account in the name FA CAM.

25. On or about October 11, 2008, T. L., a mass marketing fraud victim, sent a $1,000 MoneyGram money transfer from York, Pennsylvania payable to Michael Chin.

26. On or about October 11, 2008, the $1,000 MoneyGram money transfer listed in the preceding overt act was processed by an unindicted co-conspirator agent doing business as Family Support Organization in Toronto, Canada.  The unindicted co-conspirator issued the MoneyGram Money Transfer Check payable to Hallmark Services, not the intended payee Michael Chin.

27. On or about November 14, 2008, S. S., a Secret Shopper fraud and counterfeit check victim, sent a $2,575 MoneyGram money transfer payable to Joan Leigh Shaw, a purported business consultant.

28. On or about November 14, 2008, the $2,575 MoneyGram money transfer listed in the preceding overt act was processed by an unindicted co-conspirator agent doing business as Inter Change Services.

29. On or about November 14, 2008, the unindicted co-conspirator operating as Inter Change Services, a MoneyGram agent, issued six (6) MoneyGram MTCs totaling $18,966.44 (Cdn) payable to FA CAM, not the intended MoneyGram money transfer payee, to include a $2,986.62 (Cdn) MTC issued for the $2,575 Secret Shopper fraud induced money transfer referenced in the preceding two overt acts.

30. On or about January 14, 2009, the defendant **ALEX MGBOLU** withdrew $50,000 (Cdn) from the FA CAM account and purchased two $25,000 bank drafts, one payable to Zenith Fashions and one payable to Zenith Staffing Services.  Zenith Fashions, a MoneyGram agent, and Zenith Staffing Services were registered to an unindicted co-conspirator, the wife of the defendant **WILLIAM NNEJI**.

31. On or about February 26, 2009, D. C., a mass marketing fraud victim, sent two MoneyGram money transfers, one in the amount of $2,400 and one in the amount of $1,200 from Mount Pocono, Pennsylvania both payable to Clement Johnson.

32. On or about February 26, 2009, the $2,400 and $1,200 MoneyGram money transfers listed in the preceding overt act were processed by an unindicted co-conspirator agent doing business as Family Support Organization in Toronto, Canada.  The unindicted co-conspirator issued the MoneyGram Money Transfer Checks payable to Hallmark Services, not the intended payee Clement Johnson.

33. On or about May 16, 2009, M. T., an advance fee sweepstakes and counterfeit check victim, sent a $2,900 Western Union money transfer from Mill Hall, Pennsylvania payable to William Luster, a purported sweepstakes official.

34. On or about, May 18, 2009, the $2,900 Western Union money transfer listed in the preceding overt act was processed by an unindicted co-conspirator agent doing business as Hasty Market.  Hasty Market issued four Western Union Money Transfer Checks totaling $3,278.57 (Cdn) payable to William Luster.

35. On or about May 21, 2009, the Western Union Money Transfer Checks totaling $3,278.57 (Cdn) payable to the fictitious name William Luster were deposited to the defendant **ALEX MGBOLU's** bank account in the name FA CAM.

36. On or about May 19, 2009, L. S., a mass marketing fraud victim, sent two Western Union money transfers totaling $4,635 from Hanover, Pennsylvania.  One transfer in the amount of $1,650 was made payable to Lisa Smith.  The second transfer in the amount of $2,985 was made payable to Stacy Wowis.

37. On or about, May 19, 2009, the two Western Union money transfers listed in the preceding overt act were processed by an unindicted co-conspirator agent doing business as Daisy Mart.  Daisy Mart issued six Western Union Money Transfer Checks totaling $5,149.34 (Cdn) payable to Lisa Smith and Stacy Wowis.

38. On or about May 21, 2009,  Western Union Money Transfer Checks totaling $5,149.34 (Cdn) issued by Daisy Mart payable to the fictitious names Lisa Smith and Stacy Wowis were deposited to the defendant **ALEX MGBOLU's** bank account in the name FA CAM.

39. On or about November 19, 2009, K. D. received a fraudulent sweepstakes prize notification and counterfeit check via the United States mail in Scranton, Pennsylvania.

40. On or about December 1, 2009, K. D., an advance fee sweepstakes and counterfeit check victim, sent a $1,250 Western Union money transfer from Scranton, Pennsylvania payable to Mary West, a purported tax official.

41. On or about, December 1, 2009, the $1,250 Western Union money transfer listed in the preceding overt act was processed by an unindicted co-conspirator agent doing business as Westney # 2 Food Mart.  Westney #2 Food Mart issued two Western Union Money Transfer Checks totaling $1,255.75 (Cdn) payable to Mary West.

42. On or about December 3, 2009, the Western Union Money Transfer Checks totaling $1,255.75 (Cdn) payable to the fictitious name Mary West were deposited to the defendant **ALEX MGBOLU's** bank account in the name FA CAM.

In violation of Title 18, United States Code, Section 371, Conspiracy to Commit Section 1341 (Mail Fraud), Section 1343 (Wire Fraud), and Section 1956 (Laundering of Monetary Instruments)

## COUNTS 2 - 3
### (Mail Fraud)

The Grand Jury Further Charges:

1.     The information and allegations set forth in Count 1 of this Indictment are incorporated in Counts 2 and 3.

2.     Between July 2002 and May 2010, in the Middle District of Pennsylvania and elsewhere, the defendants **ALEX MGBOLU, CHIMA NNEJI and WILLIAM NNEJI** and other conspirators, known and unknown to the Grand Jury, aided and abetted by each other and by others known and unknown to the Grand Jury, did devise a scheme or artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, as described in Count 1 of this Indictment, and for the purpose of executing such scheme or artifice, on or about the dates set forth below, did cause any matter or thing whatever to be deposited in the U.S. Mail and delivered according to the direction thereon, as described below:

| Count | Date | City, State | Receiver | Content |
|-------|------|-------------|----------|---------|
| 2 | 5/14/2009 | LOGANTON, PA | M. T. | SWEEPSTAKES PRIZE NOTIFICATION AND $4,700 CHECK |
| 3 | 11/19/2009 | SCRANTON, PA | K. D. | SWEEPSTAKES PRIZE NOTIFICATION AND $4,875 CHECK |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS 4 - 18
### (Wire Fraud)

The Grand Jury Further Charges:

1.    The information and allegations set forth in Counts 1 through 3 of this Indictment are incorporated in Counts 4 through 18 as if fully set forth herein.

2.    Between July 2002 and May 2010, in the Middle District of Pennsylvania and elsewhere, the defendant **ALEX MGBOLU, CHIMA NNEJI AND WILLIAM NNEJI** and other co-conspirators, known and unknown to the Grand Jury, aided and abetted by each other and by others known and unknown to the Grand Jury, did devise a scheme or artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, as described in Count 1 of this Indictment, and, on or about the dates set forth below, did cause to be transmitted by means of wire, radio, or television communication in interstate and foreign commerce, any writing, sign, signal, picture or sound for the purpose of executing such scheme or artifice, as described below:

| COUNT | SND DT | SNDR FNM | AMT (US) | SND LOC CITY | RCVR FNM | RCVR LNM | RCV LOCATION | PROV |
|---|---|---|---|---|---|---|---|---|
| 4 | 9/13/2007 | J. B. | $1,100 | TOBYHANNA, PA | VICTOR | CASANI | FA CAM | ON |
| 5 | 10/5/2007 | W. T. | $3,985 | SAYRE, PA | JENNIFER | MORGAN | ZENITH FASHIONS | ON |
| 6 | 9/18/2008 | L. K. | $2,900 | CLARKS SUMMIT, PA | ANGELA | GRENOBLE | FAMILY SUPPORT ORGANIZATION | ON |
| 7 | 10/11/2008 | T. L. | $1,000 | YORK, PA | MICHAEL | CHIN | FAMILY SUPPORT ORGANIZATION | ON |
| 8 | 2/26/2009 | D. C. | $2,400 | MT POCONO, PA | CLEMENT | JOHNSON | FAMILY SUPPORT ORGANIZATION | ON |
| 9 | 2/26/2009 | D. C. | $1,200 | MT POCONO, PA | CLEMENT | JOHNSON | FAMILY SUPPORT ORGANIZATION | ON |
| 10 | 5/16/2009 | M. T. | $2,900 | MILL HALL, PA | WILLIAM | LUSTER | HASTY MARKET | ON |
| 11 | 5/19/2009 | L. S. | $1,650 | HANOVER, PA | LISA | SMITH | DAISY MART | ON |
| 12 | 5/19/2009 | L. S. | $2,985 | HANOVER, PA | STACY | WOWIS | DAISY MART | ON |
| 13 | 7/29/2009 | J. W. | $2,545 | MILL HALL, PA | STACEY | ROBINSON | HASTY MARKET | ON |
| 14 | 8/27/2009 | C. P. | $1,875 | HARRISBURG, PA | JACQUELINE | OLICH | UPS STORE | ON |
| 15 | 10/09/2009 | A. W. | $1,480 | YORK, PA | NANCY | SCOTT | UPS STORE | ON |
| 16 | 12/01/2009 | K. D. | $1,250 | DUNMORE, PA | MARY | WEST | WESTNEY | ON |
| 17 | 3/5/2010 | G. S. | $1,510 | YORK, PA | MARY | LISELLIS | JINGTOA PRINTPOST | ON |
| 18 | 4/21/2010 | J. S. | $1,510 | CLEONA, PA | NICOLE | MURRAY | JINGTOA PRINTPOST | ON |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 19 - 30
### (Laundering of Monetary Instruments)

The Grand Jury Further Charges That:

1.  The allegations contained within Counts 1 through 18 of this Indictment are incorporated in Counts 19 through 30 as if fully set forth herein.

2.  During the period July 2002 through May 2010, within the Middle District of Pennsylvania and elsewhere, the defendant **ALEX MGBOLU, CHIMA NNEJI and WILLIAM NNEJI** and others both known and unknown to the Grand Jury, aided and abetted by each other and by others known and unknown to the Grand Jury did knowingly and willfully conduct financial transactions affecting interstate commerce and foreign commerce, which involved the proceeds of specified unlawful activity, to wit, Mail Fraud in violation of 18 U.S.C. Section 1341, and Wire Fraud in violation of 18 U.S.C. Section 1343, with the intent to promote the carrying on of that specified unlawful activity, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and that while conducting the financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, as set forth below:

| Count | On or About | Financial Transaction Amount | Sender | Canadian Outlet/MTC Payee or Stamped Endorsement |
|-------|-------------|------------------------------|--------|---------------------------------------------------|
| 19 | 9/22/2008 | $2,900 (US) $2,979.62 (Cdn) MoneyGram Money Transfer and MTC | L. K. Clarks Summit, PA | Family Support Organization FA CAM |
| 20 | 10/11/2008 | $1,000 (US) $1,100.17 (Cdn) MoneyGram Money Transfer and MTC | T. L. York, PA | Family Support Organization Hallmark Services |
| 21 | 2/26/2009 | $2,400 (US) $2,886.88 (Cdn) MoneyGram Money Transfer and MTC | D. C. Mt. Pocono, PA | Family Support Organization Hallmark Services |
| 22 | 2/26/2009 | $1,200 (US) $1,443.44 (Cdn) MoneyGram Money Transfer and MTC | D. C. Mt. Pocono, PA | Family Support Organization Hallmark Services |
| 23 | 5/21/2009 | $2,900 (US) $3,278.57 (Cdn) Western Union Money Transfer and MTCs | M. T. Mill Hall, PA | Hasty Market (Howden) FA CAM |
| 24 | 5/21/2009 | $350.00 (US) $393.90 (Cdn) Western Union Money Transfer and MTC | M. T. Loch Haven, PA | Daisy Mart FA CAM |
| 25 | 5/21/2009 | $1,650 (US) $1,833.56 (Cdn) Western Union Money Transfer and MTCs | L. S. Hanover, PA | Daisy Mart FA CAM |
| 26 | 5/21/2009 | $2,985 (US) $3,315.78 (Cdn) Western Union Money Transfer and MTCs | L. S. Hanover, PA | Daisy Mart FA CAM |
| 27 | 7/31/2009 | $2,545 (US) $2,663.56 (Cdn) Western Union Money Transfer and MTCs | J. W. Mill Hall, PA | Hasty Market (Britannia) FA CAM |

| 28 | 12/3/2009 | $1,250 (US) $1,255.75 (Cdn) Western Union Money Transfer and MTCs | K. D. Dunmore, PA | Westney # 2 Food Mart FA CAM |
|----|-----------|---|---|---|
| 29 | 3/8/2010 | $1,510 (US) $1,492.15 (Cdn) Western Union Money Transfer and MTCs | G. S. York, PA | Jingtoa Printpost FA CAM |
| 30 | 4/12/2010 | $1,510 (US) $1,441.99 (Cdn) Western Union Money Transfer and MTCs | J. S. Cleona, PA | Jingtoa Printpost FA CAM |

All in violation of Title 18 U.S.C. Section 1956(a)(2).


A TRUE BILL


_Peter J. Smith_
PETER J. SMITH
United States Attorney

Dated: _9-12-2012_